IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      )
                              )
            v.                )
                              )      Criminal No. 09-82
STEPHAN ANDRE PETE (1)        )
WILLIAM JAMES PETERSON (2)    )
FRANK MURPHY (3)              )


O P I N I O N

DIAMOND, D.J.

On March 3, 2009, a grand jury returned a two-count indictment against three named defendants: Stephan Andre Pete, William James Peterson and Frank Murphy. All three were charged at Count One with conspiracy to distribute and to possess with the intent to distribute 500 grams or more of cocaine. Count Two charges only Pete with possession of a firearm in furtherance of a drug trafficking crime.

All three defendants have filed pretrial motions. Pete has filed a motion to suppress evidence (Document No. 63) and a motion to compel production of Rule 404(b) evidence (Document No. 64). Peterson also has filed a motion to suppress (Document No. 54) as well as a motion to produce evidence which the government intends to use under Rules 404(b) and 609. (Document No. 55).

Murphy has filed a motion which includes requests to compel discovery, to disclose and exclude uncharged misconduct evidence, for early disclosure of Jencks Material and for leave to file additional pretrial motions (Document No. 49). He also has filed a separate motion to join in the motion to suppress filed by Peterson. (Document No. 62).

The government has filed an omnibus brief and responses to the pretrial motions filed by all three defendants following which a motions hearing was held. All of the pretrial motions now are ripe for adjudication.

### 1) **Motions to Suppress**

Pete and Peterson have filed motions to suppress evidence[1] challenging the legality of the stop and subsequent search of a 2003 Honda Accord being operated by Peterson on February 3, 2009, which resulted in the seizure of a kilogram of cocaine as well as a firearm belonging to Pete. At the suppression hearing, the government presented the testimony of four police officers who were involved in that stop and search. The uncontradicted testimony of these officers, which the court finds credible, is briefly summarized as follows.

---

[1]   Murphy's motion to join Peterson's suppression motion will be granted.

AO 72
(Rev. 8/82)

The government's first witness was Pennsylvania State Police Trooper Ty Bintrim.  Bintrim testified that in January of 2009 he began to meet with a confidential informant ("CI") who provided information that Peterson on prior occasions had brought large quantities of cocaine from Arizona into Pennsylvania.  The CI, who knew Peterson from previous drug dealings, indicated that Peterson had been to Pennsylvania before and had dealt with a mutual friend of the CI on numerous occasions, each time bringing four kilograms of cocaine from Arizona.  Bintrim advised the CI to contact Peterson to try to set up a new drug deal.

The CI subsequently engaged in a number of telephone calls with Peterson in which they arranged for Peterson to bring five kilograms of cocaine from Arizona to Pennsylvania.  On January 19, 2009, in a phone conversation partially overheard by Bintrim, the CI advised Peterson, to whom he referred by his nickname "Greedy", that he would buy 5 kilograms of cocaine for $35,000 per kilogram. On January 25, 2009, the CI called Bintrim and advised him that Peterson said he would fly in from Arizona the following day. However, when the CI called back, Peterson said he would not be able to come until the following week.  No explanation for the change in dates was provided.

On February 2, 2009, the CI informed Bintrim that Peterson would be flying into Pittsburgh that day and that he would call the CI when he arrived.  Upon Peterson's arrival, arrangements

3

were made whereby Peterson would call the CI the following morning to set up a meeting.

On the morning of February 3, 2009, Bintrim met with fellow troopers to discuss plans for the operation.  The troopers agreed that they could not permit the transaction to take place because they did not have enough funds to purchase five kilograms of cocaine.  Accordingly, the arrest would take place prior to the actual exchange.

The troopers made arrangements to meet with the CI at a rest stop in Bridgeville.  At this meeting, the CI indicated that Peterson wanted the CI to pick him up at a Best Western Hotel in Greentree where the two of them would proceed to another hotel near the airport.  This plan was unacceptable to the troopers for safety reasons.  In addition, the CI informed the troopers that Peterson now was indicating that the transaction would be for only one kilogram of cocaine, with no reason given for the change from five kilograms.

The CI drove his car, a black 2003 Honda Accord, to the Best Western in Greentree to pick up Peterson, then brought him to a Knights Inn in Bridgeville.  Peterson then left in the CI's vehicle while the CI stayed behind in a room with Trooper Kenneth Munshower.  Other troopers followed the CI's vehicle but broke off surveillance when they became concerned that Peterson thought he was being followed and took evasive action.

4

Surveillance was set up around the Knights Inn.  When Bintrim saw the Accord approaching the intersection, he notified the other officers present.  He also observed that there were three other individuals in the vehicle in addition to Peterson.  Bintrim followed Peterson into the parking lot where the vehicle was secured and the occupants – Peterson, Pete, Murphy and a juvenile named Adonay Martinez - were taken into custody.  Bintrim testified that the interior of the vehicle was searched after one of the occupants indicated there was a gun in the back seat; however, Bintrim was not involved in that search.  The firearm was seized and the vehicle was towed to the state police barracks while a search warrant was obtained.

Bintrim was not involved in the interviewing of the defendants but he did participate in the execution of the warrant which resulted in the seizure of one kilogram of cocaine from a small bag of luggage belonging to the juvenile which was located in the trunk of the vehicle.

The government's second witness at the suppression hearing was Pennsylvania State Police Trooper Timothy Motte.  Motte testified that he was involved in the surveillance of Peterson after Peterson left the Knights Inn driving the CI's vehicle. Motte followed Peterson until Peterson attempted to "clear his tail" by pulling into a dead end then turning around.  Motte decided to terminate surveillance at that point because he

5

believed that they had been compromised.  Motte returned to the Knights Inn and set up stationary surveillance near the exit.

Motte arrived at the scene of the stop after Peterson and the three other individuals already had been removed from the vehicle. When checking for identification, Motte observed a permit to carry a firearm in Pete's wallet.  He asked Pete if he had a weapon and Pete answered that there was one in the luggage located on the back seat.  Motte retrieved from an unlocked carry-on bag located in the middle of the back seat an unloaded Glock .45 caliber semi-automatic pistol contained in a box with ammunition.  Motte subsequently prepared the affidavit and application in support of search warrant for the 2003 Honda Accord.  Government Exhibit 1. Motte played no other role in the investigation.

The government's third witness was Pennsylvania State Trooper Dennis Ulery, the vice unit supervisor.  Ulery was present at the meeting with the CI at the rest stop in Bridgeville where the plan was formulated to rent a room for the CI at the Knights Inn. Ulery followed the CI when he went to pick up Peterson at the hotel  in  Bridgeville, then returned and set up stationary surveillance in a business parking lot near the Knights Inn.  Upon Peterson's return with the other individuals in the CI's vehicle, Ulery participated in their arrests.

Ulery, along with Trooper Munshower, subsequently attempted to  take statements from all four of the individuals at the

barracks.  While Pete and Murphy declined to make statements, Peterson, after being advised of his rights, agreed to the taking of a custodial written statement.  Government Exhibit 2.  Ulery read aloud to Peterson the rights set forth on the form and Peterson indicated he understood those rights and was willing to answer questions.  Peterson then indicated that he was the "negotiator" of a deal for "the kilo" but denied that there was a deal for five kilograms.  After Peterson made that statement, he advised the officers that he did not want to answer any more questions and the interview was terminated.

The government's final witness was Pennsylvania State Police Corporal Kenneth Munshower, whose role in the investigation was supervisor to Bintrim and Ulery.  Munshower also was present at the meeting at the Bridgeville rest stop where the plans were formulated, and it was his belief that Peterson's initial plan was unacceptable for safety reasons.  The alternative plan to have the CI stay behind at a room at the Knights Inn then was formulated.

Munshower stayed in the room with the CI at the Knights Inn and both remained in the hotel during the stop.  Munshower did not participate in the arrests but was present with Ulery during the interview of Peterson at the barracks.  Munshower testified that he witnessed Ulery administer the warnings and heard Peterson's consent.  When Peterson declined to answer further questions, the interview was terminated.

7

Pete seeks suppression of the firearm and cocaine obtained as a result of the traffic stop as well as any statements that he made regarding the firearm. He argues that there was no probable cause to stop the vehicle and that the seizure of the firearm from the back seat of the vehicle without a search warrant, and the later search of the trunk of the vehicle pursuant to the subsequently obtained search warrant, were the direct result of the initial illegal stop.

Peterson seeks suppression of the cocaine seized from the trunk of the vehicle as well as his admission that he had "negotiated" the drug transaction. Peterson argues that there was no probable cause to stop the vehicle, nor was there probable cause to arrest the occupants of the vehicle. Murphy has joined in Peterson's motion and argued at the hearing that there was insufficient probable cause for the stop due to the unreliability of the CI.

The crux of all of the suppression motions is that the officers lacked the necessary probable cause to conduct the warrantless seizure of the vehicle and arrests of its occupants. However, based upon the evidence presented at the hearing, the court is satisfied that the officers had the requisite probable cause to believe that a drug offense was being committed, or was about to be committed, to justify the stop of the vehicle and the arrests of its occupants.

AO 72
(Rev. 8/82)

The Fourth Amendment prohibits "unreasonable searches and seizures...." U.S. Const. Amend. IV.   A traffic stop of a motor vehicle is a seizure of the vehicle's occupants for the purposes of the Fourth Amendment.  United States v. Johnson, 592 F.3d 442, 447 (3d Cir. 2010).  Ordinarily, "for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause."  Id. quoting United States v. Robertson, 305 F.3d 164, 167 (3d Cir.2002).

However, a failure on the part of law enforcement to obtain a warrant does not necessarily invalidate an arrest.   United States v. Stubbs, 281 F.3d 109, 122 (3d Cir. 2002).  The Supreme Court has held that where an automobile is involved, exigent circumstances exist that overcome the general warrant requirement due to the automobile's "ready mobility." See  Pennsylvania v. Labron, 518 U.S. 938, 940 (1996).

Probable cause exists whenever reasonably trustworthy information or circumstances within an arresting officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed by the person being arrested.  United States v. Laville, 480 F.3d 187, 194 (3d Cir. 2007).

"'The determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the officers at the scene.   It is the function of

✎AO 72
(Rev. 8/82)

the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense was being committed.'" United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) quoting United States v. Glasser, 750 F.2d 1197, 1206 (3d Cir. 1984).

Here, the facts available to the officers at the time were sufficient to justify a reasonable belief that a drug crime was being committed.  The officers obtained information from the CI that Peterson on numerous prior occasions had brought multiple quantities of cocaine into Pennsylvania from Arizona.  The officers worked extensively with the CI to set up a controlled purchase.  The CI engaged in numerous telephone conversations with Peterson to arrange the deal, some of which were overheard at least in part by Bintrim.

Peterson flew into Pittsburgh on February 3, 2009, to meet with the CI for the transaction.  The CI met with the troopers to formulate a plan for the operation.  Peterson then met with the CI at the Knights Inn and left to retrieve the cocaine in the CI's vehicle.  The officers attempted to follow Peterson until he engaged in what appeared to be evasive action.  Stationary surveillance was set up around the Knights Inn.  The officers then observed Peterson returning to meet with the CI, but now with three other unidentified individuals with him.

10

Based on the foregoing objective facts, the officers clearly had probable cause to believe that a drug crime was occurring, justifying the stop and arrest of the occupants of the vehicle. Probable cause was based not only on the information provided to them by the CI, but upon their own observations and knowledge gleaned through the investigation and their work with the CI.

Although Murphy argued at the hearing that the CI was unreliable, the court disagrees.  The only indicia of unreliability that Murphy was able to point to were the fact that Peterson originally was to come to Pittsburgh on January 26, 2009, but did not come until February 3, 2009, and that the original deal negotiated by the CI was for 5 kilograms, but Peterson later stated the deal was only for one kilogram.   However, rather than establish the unreliability of the CI, these discrepancies more accurately reflect on the reliability of Peterson.   While Peterson may have arrived a week late and with less cocaine than the parties had arranged, he in fact ultimately did arrive and with one kilogram of cocaine to sell to the CI.

The information in this case regarding Peterson did not come from an anonymous or unidentified informer but from an individual who worked with the police extensively in arranging a controlled buy.   The CI personally met with the officers on numerous occasions and made numerous telephone calls to Peterson to set up the deal in the presence of Trooper Bintrim.   The court is

11

satisfied that the information provided by the CI, corroborated by the officers engaged in the investigation and controlled buy, was sufficient to establish probable cause for the officers to believe that a drug offense was occurring. Accordingly, the seizure of the vehicle was lawful, and the fact that the defendants were traveling in an automobile provided the exigent circumstances justifying their warrantless arrests. Stubbs, 281 F.3d at 122.

Having found that the initial seizure of the vehicle and the arrests of its occupants were justified, the arguments of the defendants against the warrantless seizure of the firearm from luggage in the back seat and the seizure of the cocaine from the trunk of the vehicle pursuant to a search warrant readily are dismissed.

Initially, it does not appear that any of the three defendants have standing to challenge either search of the vehicle, which belonged to the CI. Standing to challenge a search requires that the individual challenging the search have a reasonable expectation of privacy in the property searched, and that he manifest a subjective expectation of privacy in the property searched. United States v. Baker, 221 F.3d 438, 442 (3d Cir. 2000); see also Rakas v. Illinois, 439 U.S. 128, 143 (1978); California v. Greenwood, 486 U.S. 35, 39 (1988).

12

Here, Pete and Murphy, as mere passengers in the CI's vehicle, clearly have no standing to challenge any search of the vehicle. See Baker, 221 F.3d at 441-42 (a passenger in a car that he neither owns nor leases typically has no standing to challenge search of that car).

Likewise, Peterson, the driver of the vehicle, neither owned nor leased it, and, as a one-time borrower of the vehicle, he also has failed to establish that he had any reasonable expectation of privacy in the CI's vehicle. Compare Baker, 221 F.3d at 442-43 (defendant had substantial control over vehicle where he had borrowed it from a friend and had been driving it for four to six weeks and therefore had a reasonable expectation of privacy in the vehicle and standing to challenge a search of it).

Although arguments were made at the hearing that Peterson was an "invitee" or "bailee" of the CI, these concepts from the law of agency do nothing to alter the fact that none of the defendants have established that they had any reasonable expectation of privacy in the vehicle or that any of them manifested a subjective expectation of privacy therein.  In the absence of such an expectation of privacy, none of the defendants have standing to challenge either the warrantless seizure of the firearm from the passenger compartment or the search of the trunk pursuant to a warrant resulting in the seizure of the cocaine.

13

Even assuming the defendants could establish standing, the warrantless seizure of the firearm from the luggage in the backseat was justified for safety reasons. It is well-settled that an officer executing a traffic stop may pat down the occupants of a vehicle and conduct a search of the passenger compartment of the vehicle if he has a reasonable suspicion that the occupants might be armed and dangerous. United States v. Bonner, 363 F.3d 213 (3d Cir. 2004).

Here, the officers stopped a vehicle whose driver they were aware had made arrangements for the sale of at least a kilogram of cocaine to a confidential informant for $35,000.00. In addition, this individual, who had been alone, unexpectedly returned to the site of the controlled transaction with three unknown passengers. In attempting to ascertain the identity of these individuals, Trooper Motte noticed an out-of-state permit to carry a firearm in Pete's wallet. When asked if he had a weapon, Pete answered in the affirmative and indicated there was one in the luggage in the back seat, within easy reach of either back seat passenger.[2] Under these circumstances, the officers had at least a reasonable suspicion that the occupants were armed,

---

[2] No Miranda warning was necessary before Trooper Motte inquired of Pete about a weapon under the "public safety" exception to Miranda, which holds that no warnings are required before asking a suspect questions necessary to protect the public or police from immediate danger. See New York v. Quarles, 467 U.S. 649 (1984).

AO 72
(Rev. 8/82)

therefore justifying the warrantless seizure of the firearm located in the passenger compartment of the vehicle.

Likewise, the search of the trunk of the vehicle pursuant to the search warrant, which yielded the cocaine that the defendants seek to have suppressed, likewise was lawful. Although the defendants argue that the search warrant was the fruit of an illegal stop, the court has found that the stop of the vehicle was justified based on probable cause. In addition, a review of the affidavit and application in support of the search warrant establishes that the warrant itself also is supported by probable cause.

Whether probable cause exists is to be determined by a practical and common sense approach. <u>Illinois v. Gates</u>, 462 U.S. 213 (1983). The appropriate inquiry is "whether, given all the circumstances set forth in the affidavit before [the magistrate], including the [veracity] and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Id</u>. at 238-39.

In <u>Massachusetts v. Upton</u>, 466 U.S. 727 (1984), the Supreme Court emphasized that the reviewing court is not to conduct a "<u>de novo</u> probable cause determination" but is to decide merely "whether the evidence reviewed as a whole provided a substantial basis for the magistrate's finding of probable cause." Thus, the

AO 72
(Rev. 8/82)

warrant is to be upheld as long as there is a "substantial basis" for a "fair probability" that specified evidence will be found in a particular place.  Id.

Upon review of the application and affidavit entered into evidence at the hearing as Government Exhibit 1, the court is satisfied that there was a substantial basis for a "fair probability that contraband or evidence of a crime" would be found in the vehicle.

Finally, Peterson argues that his custodial written statement admitting that he was the "negotiator" of the deal should be suppressed as involuntary.  This argument is without merit.

A statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." Arizona v. Fulimante, 499 U.S. 279, 288 (1991). Whether a statement is voluntarily made is determined from "the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation." Dickerson v. United States, 530 U.S. 428, 434 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

The overriding question in evaluating voluntariness is whether the law enforcement officer's tactics and statements "were so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to

16

confess." Miller v. Fenton, 796 F.2d 598, 605 (3d Cir. 1986). The government has the burden of establishing the voluntariness of any statements given. Id. at 604.

Here, the government met that burden through the uncontradicted testimony of Ulery and Munshower. The totality of the circumstances, including the details of the interrogation, establish that Peterson's statements voluntarily were made. Ulery testified that he read aloud to Peterson the rights set forth on the form and that Peterson indicated that he understood those rights and was willing to answer questions. Ulery's testimony was corroborated by Munshower.

Moreover, there is no evidence that Peterson was coerced or that the interviewing agents engaged in any type of unlawful pressure or tactics. Instead, the testimony establishes that no threats, promises or coercion were utilized and, once Peterson stated that he did not wish to answer any more questions, the interview immediately was terminated. The absence of coercion further is demonstrated by the fact that both Pete and Murphy declined to answer any questions at all and no statements were taken from either of them.

Accordingly, for the foregoing reasons, the motions to suppress evidence filed by Pete and Peterson, joined by Murphy, will be denied.

17

2)   **Motion to Compel Discovery**

Murphy has filed a motion to compel discovery requesting disclosure of numerous categories of information and material.

Generally, governmental disclosure of evidence in criminal cases is governed by Fed.R.Crim.P. 16(a)(1).  The United States Court of Appeals for the Third Circuit has recognized that discovery in criminal cases is limited to those areas delineated in Rule 16(a)(1), "with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution." United States v. Ramos, 27 F.3d 65, 68 (3d Cir. 1994).  As a general matter, these other areas are limited to the Jencks Act (18 U.S.C. §3500) and materials available pursuant to the "Brady doctrine."  Id.

The government has acknowledged its responsibilities and obligations under Rule 16(a), the Brady doctrine and the Jencks Act and has indicated that it already has complied, or intends to comply with those requirements.  However, the government objects to certain specific requests as outside the scope of Rule 16 or Brady.  Specifically, the government objects to defendant's request for the following requests as being beyond the scope of discovery: (1) the "names, addressed and telephone numbers of any informants who were used in the preparation of this case and who may or may not be called at trial"; (2) any "relevant item" in other cases in which the confidential informant was used; and, (3)

18

disclosure of "defendant's role in this conspiracy" and "if he profited in this conspiracy, how much he made." Because these requests do not fall within the ambit of Rule 16, the <u>Brady</u> doctrine, or the Jencks Act, Murphy's motion will be denied as to those requested materials.

As the government is cognizant of its obligations under Rule 16 and has stated its intent to comply with the dictates of that rule, Murphy's motion for discovery will be granted in part and denied in part, and the following order will be entered:

    1)    The government shall disclose all <u>Brady</u> exculpatory material forthwith;

    2)    The government shall disclose all <u>Brady</u> impeachment material and Rule 16(a) material no later than three days prior to trial;

    3)    The government shall disclose all Jencks material in accordance with 18 U.S.C. §3500(b), but with encouragement to disclose such material no later than ten days prior to trial.

    4)    To the extent Murphy requests information not discoverable under Rule 16, <u>Brady</u> or the Jencks Act, the motion will be denied.

### 3) **Motions for Disclosure of 404(b) Evidence**

All three defendants have filed motions requesting that the government disclose any evidence of other crimes, wrongs or acts of uncharged misconduct that the government may seek to offer under Rule 404(b) and requesting a pretrial hearing to determine the admissibility of any such evidence.

Fed.R.Evid. 404(b) permits the admission of evidence of other crimes, wrongs or acts for certain enumerated purposes, provided that, upon request by the accused, the government shall provide reasonable notice in advance of trial of the general nature of any such evidence it intends to introduce at trial.   In order to be admissible under Rule 404(b), (1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rules 401 and 402; (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice under Rule 403; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it is admitted. United States v. Vega, 285 F.3d 256, 261 (3d Cir. 2002).

The government has acknowledged its responsibility to provide advance notice of the general nature of any other crimes, wrongs or acts it intends to offer at trial and has indicated that it will seek to introduce evidence of prior drug trafficking activity among all three defendants for the 18-month period prior to February 3, 2009.   Specifically, the government will offer details about prior trips these defendants made to Pittsburgh and elsewhere to sell drugs in order to show plan, purpose, and intent and also to show that their presence in Pittsburgh was not innocent or an isolated event.

The motions for notice of Rule 404(b) evidence filed by Pete, Peterson and Murphy will be granted.   Should the government

20

subsequently decide to use at trial any additional other crimes, wrongs or acts evidence not already disclosed, such evidence should be disclosed no later than ten days prior to trial. To the extent defendants seek to have any Rule 404(b) evidence excluded from trial, such a request is premature, and the motions will be denied without prejudice in that regard.

As to Peterson's request under Fed. R. Evid. 609 for notice of prior convictions that the government intends to use at trial[3], the government indicates that it intends to offer any and all prior qualifying felony convictions on cross-examination should any of the defendants testify, and states that it already has provided copies of prior criminal histories to each of the defendants at their arraignments.

### 4)   Motion for Early Disclosure of Jencks Materials

Murphy has filed a motion requesting early disclosure of Jencks Act material.

---

[3]   Rule 609(a) allows, for the purpose of attacking the credibility of an accused, the admission of evidence that the accused has been convicted of any crime punishable by death or imprisonment in excess of one year if the court determines that the probative value of admitting that evidence outweighs the prejudicial effect to the accused, and the rule further provides that evidence that any witness has been convicted of a crime involving dishonesty or false statement shall be admitted regardless of punishment. The only advance notice requirement in Rule 609 is that the government is required to provide "sufficient advance written notice" of its intent to use evidence of a conviction more than ten years old. Fed.R.Evid. 609(b).

21

The Jencks Act, 18 U.S.C. §3500(b), requires the government to disclose prior recorded statements of its witnesses, when related to the subject matter of their testimony, after each witness testifies on direct examination. United States v. Weaver, 267 F.3d 231, 245 (3d Cir. 2001). According to 18 U.S.C. §3500(a), "no statement or report in the possession of the United States which was made by a government witness or prospective government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."

There is no authority by which a court can order the government to provide Jencks Act statements prior to the time a witness has testified on direct examination at trial. Accordingly, Murphy's motion for early disclosure of Jencks Act materials will be denied. However, the court's order will encourage the government to provide all defendants with Jencks Act materials ten days prior to trial.

**5)  Leave to File Additional Motions**

Murphy has filed a motion for leave to file additional pretrial motions. In light of the fact that all of the defendants have had more than ample opportunity to file pretrial motions, and

22

AO 72
(Rev. 8/82)

all, including Murphy, have taken advantage of that opportunity, this motion will be denied.

An appropriate order will follow.

Gustave Diamond
United States District Judge

Date: _March 10, 2010_

cc:  Margaret E. Picking
     Assistant U.S. Attorney

     Sally A. Frick, Esq.
     1601 Frick Building
     437 Grant Street
     Pittsburgh, PA 15219

     Thomas Livingston
     Assistant Federal Public Defender

     Stephen H. Begler, Esq.
     100 Ross Street
     Suite 304
     Pittsburgh, PA 15219

23

AO 72
(Rev. 8/82)